[No. B158551. Second Dist., Div. Six. Sept. 18, 2003.]

KITTY-ANNE MUSIC CO., et al., Plaintiffs and Appellants, v. DONALD SWAN, Defendant and Respondent.

**COUNSEL**

Dennis V. Greene; Freund & Brackey, Thomas A. Brackey II; and Nate G. Kraut for Plaintiffs and Appellants.

Gaims, Weil, West & Epstein and Jeffrey B. Ellis for Defendant and Respondent.

**OPINION**

**GILBERT, P. J.—** ■ A party successfully opposes a summary judgment motion. He then moves for summary judgment based upon the same evidence used in the summary judgment motion he resisted. The rule of judicial estoppel does not apply against the party because he has not taken inconsistent positions, nor has he disrupted the orderly administration of justice.

Kitty-Anne Music Co., Inc. and Milton Delugg, president of Kitty-Anne Music Co., Inc., appeal a summary judgment in favor of Donald Swan.[1] We affirm.

### FACTS

Al Stillman was a popular songwriter who wrote the lyrics to many popular songs that are still performed. In 1979, he died, and his widow Pauline inherited his music royalty rights. In 1982, she granted publisher's royalty rights to Kitty-Anne in exchange for $300,000, plus payment of the

---

[1] We refer to the plaintiffs collectively as "Kitty-Anne," except where clarity demands a distinction.

"writer's share" of future royalties on specified Stillman songs. The 1982 agreement required Kitty-Anne to "keep complete and accurate books and records" regarding the royalties and to allow Stillman and her successors "to audit and inspect such books and records" upon reasonable notice. The agreement also required Kitty-Anne to protect and enforce the Stillman royalty rights by appropriate means, including litigation.

In 1990, defendant Donald Swan inherited the Stillman royalty rights from his aunt Pauline. Swan believed that Kitty-Anne was wrongfully withholding royalties on the Stillman songs. In 1999, he brought an action against Kitty-Anne, alleging breach of contract and fraud, among other causes of action. Kitty-Anne then paid Swan an additional $70,000 in revised royalties, and the parties later agreed to settle the lawsuit.

The parties also discussed sale of the Stillman royalty rights to Kitty-Anne. On November 1, 2000, the parties memorialized the "proposed terms" in a two-page letter, later referred to by Kitty-Anne as the "deal memo." The terms provided for sale of the writer's royalties for $375,000, payable in part on December 15, 2000 ($93,750) and in part on January 15, 2001 ($281,250). Paragraph 4 reserved Swan's right to royalties accruing prior to July 1, 2000, but collected from licensees and users thereafter. Paragraph 6 required "[a] mutual release and dismissal of all existing and potential claims between the parties." .

Paragraph 1 of the deal memo also provided for settlement and dismissal of Swan's 1999 lawsuit against Kitty-Anne in exchange for Kitty-Anne's payment of $20,000. Swan promised to execute a release and settlement agreement regarding the lawsuit and to request a dismissal thereof. On November 10, 2000, Swan executed a written release and settlement, Kitty-Anne paid Swan $20,000, and Swan thereafter dismissed the lawsuit.

Kitty-Anne then prepared a draft agreement entitled "Purchase of Writer's Royalties," formalizing the terms of the deal memo.[2] (In a deposition, Swan testified that the deal memo was "an incomplete document" that contemplated the drafting and execution of further documents.) Swan objected to the draft agreement, however, because it did not comply with paragraphs 4 and 6 of the deal memo, concerning pre-July 2000 royalties and execution of a mutual release. The draft agreement also included an integration clause, thus precluding reliance upon or enforcement of the deal memo. The draft agreement did not provide Swan with auditing rights of pre-July 2000 royalties received by Kitty-Anne.

---

[2] At times in the trial court and in the appellate briefs, the parties also refer to this document as a "copyright assignment" or a "long–form copyright assignment." To ease the reader's task, we refer to the document as a "purchase agreement" or "draft agreement."

Correspondence between the parties ensued. Swan amended the draft agreement and extended the time for Kitty-Anne's first payment. Kitty-Anne did not make payment, however, because the parties did not agree upon and execute the draft agreement. Each party threatened an action for breach of contract. At the end of December 2000, Swan terminated the agreement because he believed Kitty-Anne was in breach.

On January 30, 2001, Kitty-Anne brought an action against Swan for breach of contract, fraud, and defamation, among other causes of action.

Following Swan's answer to the complaint, Kitty-Anne moved for partial summary judgment or summary adjudication of the contract causes of action. Kitty-Anne presented evidence of the deal memo, the correspondence between the parties regarding terms of the draft agreement, and Swan's assertion at the end of December 2000, that Kitty-Anne had breached the deal memo.

The trial court denied Kitty-Anne's motion for summary adjudication. It found triable issues of material fact regarding Kitty-Anne's willingness to perform. The trial court's order referred to evidence that Kitty-Anne may have breached the deal memo and precluded further performance by the parties by demanding that Swan execute a later agreement with materially different terms.

Swan then brought a motion for summary judgment of all causes of action, including defamation. He relied upon evidence identical or similar to that presented in response to Kitty-Anne's earlier motion. Kitty-Anne resisted Swan's motion for summary judgment by relying upon evidence it presented previously. Kitty-Anne also asserted that the trial court's ruling on the previous motion for summary adjudication was "the law of the case."

The trial court concluded that there was no triable issue of material fact regarding any cause of action. It then entered summary judgment in favor of Swan.

Kitty-Anne appeals and contends the trial court improperly granted summary judgment regarding the contract causes of action.

DISCUSSION

I.

In review of a summary judgment, we examine the record independently to determine whether disputed factual issues exist. (*Certain Underwriters at Lloyd's of London v. Superior Court* (2001) 24 Cal.4th 945,

972 [103 Cal.Rptr.2d 672, 16 P.3d 94].) "We review the trial court's decision de novo, considering all of the evidence the parties offered in connection with the motion . . . and the uncontradicted inferences the evidence reasonably supports." (*Merrill v. Navegar, Inc.* (2001) 26 Cal.4th 465, 476 [110 Cal.Rptr.2d 370, 28 P.3d 116].) As a practical matter, we apply the rules and standards of the trial court to determine whether triable factual issues exist. (*Zavala v. Arce* (1997) 58 Cal.App.4th 915, 925–926 [68 Cal.Rptr.2d 571] [discussion of summary judgment rules and analysis].) This is what we have done here.

## II.

Kitty-Anne argues that Swan is estopped to claim that no triable issues of material fact exist because he asserted the contrary in response to Kitty-Anne's previous summary adjudication motion. Kitty-Anne relies upon the rule of judicial estoppel discussed in *Jackson v. County of Los Angeles* (1997) 60 Cal.App.4th 171, 181–183 [70 Cal.Rptr.2d 96] (" 'Judicial estoppel prevents a party from asserting a position in a legal proceeding that is contrary to a position previously taken in the same or some earlier proceeding' ").

Judicial estoppel applies where a party takes inconsistent positions that affect the orderly administration of justice. (*Jackson v. County of Los Angeles, supra,* 60 Cal.App.4th 171, 181.) Requirements for application of the rule include a party's taking two positions in judicial or administrative proceedings, success in the assertion of the first position, inconsistency between the two positions, and a lack of ignorance, fraud, or mistake in asserting the first position. (*Id.,* at p. 183.) The doctrine requires that the positions be clearly inconsistent " 'so that one necessarily excludes the other.' " (*Id.,* at p. 182.)

Judicial estoppel is an extraordinary remedy that is applied "with caution." (*Haley v. Dow Lewis Motors, Inc.* (1999) 72 Cal.App.4th 497, 511 [85 Cal.Rptr.2d 352].) To invoke the rule, a party's inconsistent position must arise from intentional wrongdoing or an attempt to obtain an unfair advantage. (*Id.,* at pp. 509–510.) The determination whether judicial estoppel applies is a question of law. (*Kelsey v. Waste Management of Alameda County* (1999) 76 Cal.App.4th 590, 597 [90 Cal.Rptr.2d 510].)

The rule does not apply here because Swan did not attempt to obtain an unfair advantage; nor were his positions inconsistent. He resisted Kitty-Anne's summary adjudication motion by presenting evidence sufficient to raise triable factual issues. (Swan's argument stated that "at bear [*sic*] minimum, these circumstances create a triable fact . . . .") The evidence presented in favor of and in response to the earlier motion convinced Swan to

move for summary judgment. He then bore the burden of proving that he was entitled to judgment as a matter of law. Swan's positions in the trial court did not play " 'fast and loose with the court[.]' " (*Haley v. Dow Lewis Motors, Inc., supra,* 72 Cal.App.4th 497, 509.) As a matter of law, the rule of judicial estoppel does not apply here.

## III.

Kitty-Anne complains that the trial court did not review and consider the responsive evidence before ruling. Kitty-Anne asserts that its failure to refer to evidence in the separate statement of undisputed facts should not preclude consideration of the evidence. (Code Civ. Proc., § 437c, subd. (b) ["Each material fact contended by the opposing party to be disputed shall be followed by a reference to the supporting evidence. Failure to comply with this requirement of a separate statement may constitute a sufficient ground, in the court's discretion, for granting the motion"].) Kitty-Anne points out that its written argument (points and authorities) incorporated and relied upon evidence presented in the previous summary adjudication motion.

Although the trial court chastised Kitty-Anne for evidentiary shortcomings in its responding papers, Kitty-Anne did discuss some responsive evidence during oral argument of the motion. The trial court responded: "I understand all those facts." The trial judge was familiar with the lawsuit because he had ruled upon the earlier summary adjudication motion. We presume the trial court read and considered Kitty-Anne's written argument prior to ruling. Moreover, we have independently reviewed the evidence submitted in support of and in opposition to Swan's motion. (*Certain Underwriters at Lloyd's of London v. Superior Court, supra,* 24 Cal.4th 945, 972.) As discussed below, we conclude that summary judgment is proper. (Pt. V., *post.*)

## IV.

Kitty-Anne also asserts the trial court did not reevaluate its motion for partial summary judgment or summary adjudication. It points out that its evidentiary showing included declarations from attorneys knowledgeable in intellectual property law who stated that the deal memo was enforceable and that execution of further documents was not required.

Kitty-Anne does not cite authority requiring the trial court to reevaluate its earlier ruling. ■ Moreover, questions regarding the parties' intent, the completeness of the deal memo, or its enforceability, are legal issues for the court to resolve and not matters for expert opinion. (*Parsons v. Bristol Development Co* (1965) 62 Cal.2d 861, 865 [44 Cal.Rptr. 767, 402 P.2d 839] [interpretation of a contract is a question of law for the court].)

## V.

Kitty-Anne argues that Swan's motion for summary judgment should not have been granted because there is a conflict whether the deal memo is the parties' contract and whether the draft agreement is a contract or merely a copyright assignment form to be recorded. We disagree and conclude as a matter of law, the trial court properly granted summary judgment. (*Merrill v. Navegar, Inc., supra,* 26 Cal.4th 465, 476 [standard of review].)

█ Interpretation of a written instrument is generally a question of law. (*Parsons v. Bristol Development Co., supra,* 62 Cal.2d 861, 865.) Contract interpretation "is essentially a judicial function to be exercised according to the generally accepted canons of interpretation so that the purposes of the instrument may be given effect. [Citations.]" (*Ibid.*) In interpreting a contract, the court considers the language of the contract, the circumstances under which the parties negotiated or entered into the contract, the object, nature and subject matter of the contract, and the subsequent conduct of the parties. (*Morey v. Vannucci* (1998) 64 Cal.App.4th 904, 912 [75 Cal.Rptr.2d 573].)

"[T]he practical construction placed upon [a contract] by the parties before any controversy arises as to its meaning affords one of the most reliable means of determining the intent of the parties." (*Bohman v. Berg* (1960) 54 Cal.2d 787, 795 [8 Cal.Rptr. 441, 356 P.2d 185].) By their actions here, the parties intended to execute additional documents to carry out the terms of the deal memo which Kitty-Anne acknowledges is the parties' contract. (See *Copeland v. Baskin Robbins U.S.A.* (2002) 96 Cal.App.4th 1251, 1255–1256 [117 Cal.Rptr.2d 875]; *Stockwell v. Lindeman* (1964) 229 Cal.App.2d 750, 755–756 [40 Cal.Rptr. 555].)

Kitty-Anne drafted and forwarded to Swan a draft agreement entitled "Purchase of Writer's Royalties." It is undisputed this agreement contained terms inconsistent with the deal memo. The draft agreement did not contain a mutual release nor reserve pre-July 2000 royalties to Swan. It also contained an integration clause which in effect abrogated the deal memo.

Although Kitty-Anne professed it was ready to pay the initial payment, it also stated that "it is obvious that the first payment date . . . cannot be met" given Swan's objections to the draft agreement. Kitty-Anne's characterization of the draft agreement as a mere copyright assignment for recordation is chimerical. Kitty-Anne posits that Swan thwarted performance of the deal memo, the parties' contract, by tying it to the draft agreement. But in fact, Kitty-Anne supplanted the deal memo with the draft agreement. Had Swan signed the draft agreement, it is doubtful Kitty-Anne would be arguing that the deal memo was the contract. The draft agreement drastically changed

significant provisions of the deal memo and required Swan's signature. When Kitty-Anne did not make the initial payment or agree to modification of the draft agreement, Swan properly declared Kitty-Anne in breach and terminated the contract.

The judgment is affirmed. Kitty-Anne shall bear costs on appeal.

Coffee, J., and Perren, J., concurred.

Appellants' petition for review by the Supreme Court was denied November 25, 2003. Brown, J., did not participate therein.