NOTE: This disposition is nonprecedential.

# United States Court of Appeals for the Federal Circuit

---

**EVOLVED WIRELESS, LLC,**

*Plaintiff-Appellant*

**v.**

**HTC CORPORATION, HTC AMERICA, INC., MOTOROLA MOBILITY LLC, ZTE (USA) INC., MICROSOFT CORPORATION, MICROSOFT MOBILE OY, NOKIA INC., SAMSUNG ELECTRONICS CO., LTD., SAMSUNG ELECTRONICS AMERICA, INC.,**

*Defendants-Appellees*

---

2020-1335, 2020-1337, 2020-1339, 2020-1340, 2020-1363

---

Appeals from the United States District Court for the District of Delaware in Nos. 1:15-cv-00543-JFB-SRF, 1:15-cv-00544-JFB-SRF, 1:15-cv-00545-JFB-SRF, 1:15-cv-00546-JFB-SRF, 1:15-cv-00547-JFB-SRF, Senior Judge Joseph F. Bataillon.

---

Decided: January 26, 2021

---

CHRISTOPHER GRANAGHAN, Nelson Bumgardner Albritton P.C., Fort Worth, TX, argued for plaintiff-appellant. Also represented by ERIC M. ALBRITTON, ANDREW J.

WRIGHT.

VICTORIA FISHMAN MAROULIS, Quinn Emanuel Urquhart & Sullivan, LLP, Redwood Shores, CA, argued for all defendants-appellees. Defendants-appellees Samsung Electronics Co., Ltd. and Samsung Electronics America, Inc. also represented by TODD MICHAEL BRIGGS, KEVIN P.B. JOHNSON; PUSHKAL MISHRA, Los Angeles, CA; DAVID COOPER, THOMAS PEASE, New York, NY; CARL G. ANDERSON, San Francisco, CA.

STEPHEN S. KORNICZKY, Sheppard, Mullin, Richter & Hampton LLP, San Diego, CA, for defendants-appellees HTC Corporation, HTC America, Inc. Also represented by MARTIN BADER, ERICKA SCHULZ.

MITCHELL G. STOCKWELL, Kilpatrick Townsend & Stockton LLP, Atlanta, GA, for defendant-appellee Motorola Mobility LLC. Also represented by RICHARD W. GOLDSTUCKER; TAYLOR HIGGINS LUDLAM, Raleigh, NC.

CHARLES M. MCMAHON, McDermott Will & Emery LLP, Chicago, IL, for defendant-appellee ZTE (USA) Inc. Also represented by BRIAN ANDREW JONES; JAY REIZISS, Washington, DC.

RICHARD ALAN CEDEROTH, Sidley Austin LLP, Chicago, IL, for defendants-appellees Microsoft Corporation, Microsoft Mobile Oy, Nokia Inc. Also represented by NATHANIEL C. LOVE.

————————————

Before DYK, PLAGER, and MOORE, *Circuit Judges.*

DYK, *Circuit Judge.*

Plaintiff Evolved Wireless, LLC ("Evolved") is the owner of U.S. Patent No. 7,809,373 ("the '373 patent"). Evolved appeals a decision of the United States District

Court for the District of Delaware granting summary judgment in five related cases on Evolved's claim of infringement of the '373 patent in favor of defendants HTC Corp., HTC America, Inc., Motorola Mobility LLC, ZTE (USA) Inc., Microsoft Corp., Microsoft Mobile Oy, Nokia Inc., Samsung Electronics Co., Ltd., and Samsung Electronics America, Inc. (collectively the "Defendants"). The district court concluded that Evolved's patent infringement claims were barred by a license agreement and the doctrine of patent exhaustion. Although the district court correctly interpreted the license agreement and concluded that the agreement barred the infringement claims for the period that it was in effect, the summary judgment order did not address the question whether the license agreement had been terminated, such that the license did not exist for the post-termination period. We therefore affirm in part, vacate in part, and remand for further proceedings.

BACKGROUND

I

For wireless cellular communications to work properly, each component within a network must operate using a shared set of standards. First-generation ("1G") wireless networks were developed locally within individual countries; as a result, a device built in accordance with one country's standards could not work on another country's network. Starting with second-generation ("2G") networks, and continuing today, global cellular standards have been developed by international organizations.

In the late 1990s, two such organizations developed two third-generation ("3G") cellular standards, called "WCDMA" and "CDMA2000." Both standards rely on code division multiple access ("CDMA") technology but are incompatible with each other. To avoid this incompatibility problem, a single fourth-generation ("4G") standard, known as "long-term evolution" ("LTE"), commenced development in 2004 and was standardized in 2008. Devices

may be compatible with one or more standards and are referred to as "single-mode" or "multi-mode" accordingly.

A patent that covers technology necessary to a standard is a "standard-essential patent." Participants in the standards development process must commit to licensing their standard-essential patents on fair, reasonable, and nondiscriminatory terms.

## II

The sole patent at issue in this case is the '373 patent, which describes a method for handing over a mobile device from one cell tower to another under the LTE standard.[1] In 1993, LG Electronics, Inc. ("LGE"), the original owner of the '373 patent, granted a license to Qualcomm, a developer and supplier of wireless components.[2] LGE also declared the '373 patent essential to the 4G LTE standard. An entity known as TQ Lambda bought the '373 patent from LGE in January 2014 and sold it to Evolved in

---

[1] This case originally involved infringement claims under five patents. The parties stipulated to dismissal with respect to three of the patents. The U.S. Patent Trial and Appeal Board found the fourth patent unpatentable, and we summarily affirmed in *Evolved Wireless, LLC v. ZTE (USA) Inc.*, 778 F. App'x 967 (Fed. Cir. 2019). *See* Appellant's Br. at 20 n.8.

[2] The district court treated the license as stemming from provisions in the agreement whereby LGE covenanted not to sue Qualcomm or its customers for infringement of the subject patents. *See* J.A. 30, 32. Evolved notes that the license consists of "two separate covenants not to sue: a covenant not to sue Qualcomm . . . and a covenant not to sue Qualcomm's customers." Appellant's Br. at 14–15. The characterization of the agreement as a license agreement or as a covenant not to sue has no effect on the underlying substantive issues.

September 2014.  Evolved's acquisition of the '373 patent was subject to the preexisting license agreement.  The central question is whether the accused products were within the scope of that license agreement.  If the products were licensed, the parties agree that Defendants are not liable for infringement for the period that the license agreement was in effect.

The license agreement was amended several times in 1996, 1998, 2004, 2007, and 2010.  In relevant part, under the license agreement, LGE granted Qualcomm limited covenants to use certain intellectual property.  The agreement did not identify the patents subject to the agreement.  Instead, the license agreement provided that LGE would not bring claims for patent infringement against Qualcomm or Qualcomm customers (such as Defendants) for uses of LGE's patents that are technically or commercially necessary to make, sell, or use a "Subscriber Unit."

The license agreement originally defined a Subscriber Unit as a "complete CDMA and/or Dual Mode CDMA telephone, including but not limited to mobile, transportable and portable telephones, which incorporates all or any part of QUALCOMM Intellectual Property and can be used, without any additional equipment or components being attached thereto, to initiate and receive Wireless telecommunications transmissions."  J.A. 21–22, 2216.  In the 2004 amendments, the definition of Subscriber Unit was changed to "a Complete CDMA Telephone or a CDMA Modem Card, and <u>any subsequent generation products.</u>" J.A. 2313 (emphasis added). The definition of "Subscriber Unit" thus read:

> "Subscriber Unit" shall mean a Complete CDMA Telephone or a CDMA Modem Card, and <u>any subsequent generation products.</u>"

J.A. 2313 (emphasis added).

Another relevant provision in the license agreement, as amended in 2004, defined a "Complete CDMA Telephone" as

> any complete CDMA and/or complete Dual Mode CDMA telephone, including but not limited to fixed, mobile, transportable and portable telephones, which incorporates all or any part of the QUALCOMM Intellectual Property and can be used, without any additional equipment or components being attached thereto, to initiate and receive Wireless telecommunications transmissions.

J.A. 2312. This definition was amended in 2010 to cover multi-mode devices as follows:

> "Complete CDMA Telephone" means any complete CDMA (including multi-mode) terminal, including but not limited to a fixed, mobile, transportable or portable telephone or data terminal, which (i) incorporates all or any part of the QUALCOMM Intellectual Property and (ii) can be used, without any additional equipment or components being attached thereto, to initiate and/or receive Wireless communications.

J.A. 2440 (emphasis added). Under the 2010 amendments, "Wireless" was defined to "include[], without limitation (i) any CDMA-based wireless wide area standard . . . and (ii) any updates or revisions to any of the foregoing." J.A. 2443. As noted above, by this time, fourth-generation LTE had already been standardized to succeed the third-generation standards.

The license agreement also established an "Improvement Period," allowing the license to cover relevant intellectual property subsequently developed or acquired by the parties. The 2010 amendments extended the Improvement Period through December 31, 2010, which encompasses the October 5, 2010 issuance of the '373 patent.

## III

In 2015, Evolved sued the Defendants, as well as Apple, Inc.,[3] in the United States District Court for the District of Delaware, alleging infringement of the '373 patent. Defendants produce multi-mode cellular phones, tablets, and other devices; these devices incorporate Qualcomm chipsets that allegedly practice the '373 patent, but are also alleged to be licensed under the agreement. In 2017, the parties filed cross-motions for summary judgment. On February 21, 2019, Evolved informed the district court that the license agreement had been terminated; the same day, the district court denied without prejudice the parties' cross-motions for summary judgment, allowing the motions to be renewed after trial if necessary.

The district court later decided to reconsider the motions for summary judgment on the issues of licensing and patent exhaustion and subsequently entered summary judgment of noninfringement. The district court found that the license agreement authorized Qualcomm's use of the '373 patent and that the doctrine of patent exhaustion precluded an infringement action against Qualcomm's customers (i.e., Defendants). Although Evolved argued that Defendants should be liable, at minimum, for infringing activity occurring after the alleged termination date of the license agreement, the district court's order did not address the alleged 2018 termination of the license agreement.

---

[3]   Evolved proceeded to trial separately against Apple, which resulted in a jury verdict of noninfringement. That verdict was separately on appeal before this court under Case No. 2019-2362. On June 23, 2020, the appeal was voluntarily dismissed pursuant to Federal Rule of Appellate Procedure 42(b) and is not otherwise relevant here. *See* Order Granting Mot. to Dismiss Appeal Pursuant to Fed. R. App. P. 42(b), *Evolved Wireless LLC v. Apple Inc.*, No. 2019-2362 (Fed. Cir. June 23, 2020), ECF No. 31.

Evolved appeals.   We have jurisdiction under 28 U.S.C. § 1295(a)(1).

## DISCUSSION

This appeal presents two issues: first, whether the district court correctly interpreted the license agreement to bar Evolved's infringement claims for the period before the alleged termination of the license, and second, whether the district court properly granted summary judgment without addressing the alleged termination of the license agreement in 2018.

I

The license agreement is governed by California law, J.A. 2237, which regards contract interpretation as a question of law generally subject to de novo review. *See Kitty-Anne Music Co. v. Swan*, 112 Cal. App. 4th 30, 37 (2003) (citing *Parsons v. Bristol Dev. Co.*, 62 Cal. 2d 861, 865 (1965)); *see also Rembrandt Data Techs., LP v. AOL, LLC*, 641 F.3d 1331, 1336 (Fed. Cir. 2011) (citing *Lucent Techs., Inc. v. Gateway, Inc.*, 543 F.3d 710, 717 (Fed. Cir. 2008)). We review summary judgment of noninfringement de novo. *Accent Packaging, Inc. v. Leggett & Platt, Inc.*, 707 F.3d 1318, 1325 (Fed. Cir. 2013) (citing *Laryngeal Mask Co. v. Ambu A/S*, 618 F.3d 1367, 1370 (Fed. Cir. 2010)).

If Qualcomm, Defendants' chipset supplier, had a valid license to practice the '373 patent, Evolved's right to sue Defendants for infringement of the '373 patent is exhausted by that license, since they purchased licensed products from an authorized source (viz., Qualcomm). *See Quanta Comput., Inc. v. LG Elecs., Inc.*, 553 U.S. 617, 638 (2008) ("The authorized sale of an article that substantially embodies a patent exhausts the patent holder's rights and prevents the patent holder from invoking patent law to control postsale use of the article."). Neither party disputes this basic principle, nor do the parties dispute that the '373 patent is covered by the license if it is technically or

commercially necessary to produce "Subscriber Units" within the meaning of the agreement.

The parties' dispute focuses on whether the accused products meet the definition of Subscriber Units. Evolved argues that Defendants' accused devices are not Subscriber Units within the meaning of the agreement, and that the '373 patent, which pertains only to the 4G LTE standard, is beyond the scope of the license. Defendants respond that their accused devices qualify as Subscriber Units and that the '373 patent is therefore within the scope of the license agreement. We conclude that Defendants' interpretation of the license agreement is correct.

First, following the 2004 amendments to the license agreement, a Subscriber Unit has been defined as "a Complete CDMA Telephone or a CDMA Modem Card, and any subsequent generation products." J.A. 22, 2313. Defendants argue that the term "subsequent generation products" includes products that operate using a standard that is subsequent to the third-generation (3G) CDMA standard. Evolved, by contrast, argues that this term refers only to CDMA-enabled products (i.e., 3G products other than phone and modem cards) that were subsequently developed.

Evolved's interpretation ignores the established meaning of "generation" in this context. Each set of cellular standards is commonly demarcated as a "generation," and the "G" in the abbreviations "2G," "3G," "4G," and most recently "5G" stands for "generation." Tellingly, even Evolved's complaint and its briefing in this appeal adhere to the convention of classifying cellular standards in different generations.[4] The natural reading of "subsequent

---

[4]    *See, e.g.*, J.A. 287–88 (Evolved's complaint, describing progression from "first generation ('1G') mobile phones" through "second generation ('2G') phones" and "third

generation products," then, encompasses devices that rely on more recent standards than the 3G CDMA standard.

Evolved's proposed interpretation is not consistent with this usage. Evolved offers no evidence whatsoever that "generation" is used to differentiate between products operating on the *same* cellular standard. And the original licensing agreement on its face was not limited to existing CDMA products. *See* J.A. 2216, 2440. Evolved further argues that the canon of *ejusdem generis* (Latin for "of the same kind") restricts the meaning of "subsequent generation products" to CDMA-enabled devices likes phones and modem cards, but this argument cannot defeat the otherwise clear meaning of the license agreement—that a "subsequent generation" refers to a cellular standard developed after third-generation CDMA. *See Hymas v. United States*, 810 F.3d 1312, 1321–22 (Fed. Cir. 2016) (explaining that *ejusdem generis* "comes into play only when there is some uncertainty as to the meaning of a particular clause") (quoting *United States v. Turkette*, 452 U.S. 576, 581 (1981)).

Evolved also argues that the '373 patent is not technically necessary to make a "Complete CDMA Telephone," which must be able, inter alia, "to initiate and/or receive Wireless communications." Appellant's Br. at 38–39 (quoting J.A. 2440). Evolved argues that the definition of "Wireless" is restricted only to 3G CDMA technology. But any definition of the term "Complete CDMA Telephone" is irrelevant to the scope of the term "subsequent generation products," which is an independent subcategory of "Subscriber Units."

---

generation ('3G') phones"); Appellant's Br. at 7–8 (describing development of "first-generation ('1G') networks," "second-generation ('2G') networks," and "[t]hird-generation ('3G') network technology").

Given the scope of "subsequent generation products," and because the '373 patent is directed to products that utilize the fourth-generation LTE standard, we conclude that the accused products are Subscriber Units within the meaning of the license agreement and that Evolved's infringement action is accordingly barred during the period that the licensing agreement was in effect.

This conclusion is bolstered by the 2010 amendments to the license agreement, in which LGE and Qualcomm changed the definition of a "Complete CDMA Telephone" to expressly include "multi-mode" devices. The parties agree that the term "multi-mode," which LGE and Qualcomm added in 2010 (i.e., after the standardization of fourth-generation LTE), includes devices that can operate using the CDMA standard and at least one other standard. To give effect to the term "multi-mode," it cannot be the case that, within the meaning of the license agreement, only CDMA-related patents can be necessary to a multi-mode CDMA device.

Evolved argues, however, that a multi-mode device could support 2G and 3G, and that the use of the term "multi-mode" does not imply the ability to support 4G products using the '373 patent. But the timing of the 2010 amendment suggests that the term "multi-mode" referred to the existing 3G standard and the newly completed 4G standard, rather than being limited to 3G and the earlier 2G standard.

Evolved also argues that the license agreement only encompassed improvements to CDMA technology—rather than any upgrades to subsequent-generation standards—because the Improvement Period ended on December 31, 2006, prior to the 2008 standardization of 4G LTE. This argument ignores the fact that the 2010 amendments extended the Improvement Period through December 31, 2010, which covers both the standardization of 4G LTE and the publication of the '373 patent. Indeed, the license's

reference to "future evolutions of such standards" in the recitals in the 2004 amendments further supports our interpretation, as 4G LTE is a future evolution of the 3G CDMA standard. *See* J.A. 2311

Evolved finally contends that summary judgment was inappropriate because the district court was not able to interpret the license agreement without a full, unredacted version thereof. As Evolved mentions this argument only briefly in a footnote, we find it inadequately developed and therefore waived. *See, e.g.*, *Shell Oil Co. v. United States*, 896 F.3d 1299, 1313 n.14 (Fed. Cir. 2018) (quoting *United States v. Great Am. Ins. Co.*, 738 F.3d 1320, 1328 (Fed. Cir. 2013)) ("It is well established that arguments that are not appropriately developed in a party's briefing may be deemed waived.").

The license agreement covers subsequent generation products and multi-mode CDMA devices, and therefore precludes infringement for the period that it was in effect.

## II

We now turn to the alleged termination of the license agreement.

The license agreement provided that "either Party shall be entitled to terminate this License Agreement as of December 31, 2018 by providing written notice to the other Party no later than June 1, 2018." J.A. 3530. Evolved points out that in a letter dated May 21, 2018, LGE informed Qualcomm that it was exercising its option to terminate the license agreement, effective December 31, 2018. In an email dated February 15, 2019, counsel for LGE informed Evolved of the termination of the license agreement. On February 21, 2019, Evolved filed a "Notice of Supplemental Facts" informing the district court of the termination.

The district court's summary judgment order does not address the alleged termination. The parties disagree as

to the significance of this silence.  Evolved argues that the district court considered the evidence of the termination and found it irrelevant, and that it was erroneous to grant summary judgment without addressing the termination of the license agreement, which is relevant to the existence of a license.  Defendants respond that Evolved's Notice of Supplemental Facts regarding the termination did not comply with the district court's local rules or scheduling order, and that the district court acted within its discretion by disregarding the notice.

We review a district court's decision to exclude evidence under regional circuit law.  *Del. Valley Floral Grp., Inc. v. Shaw Rose Nets, LLC*, 597 F.3d 1374, 1379 (Fed. Cir. 2010).  In the Third Circuit, evidentiary decisions are reviewed for abuse of discretion.  *Hirst v. Inverness Hotel Corp.*, 544 F.3d 221, 225 (3d Cir. 2008) (citing *Marra v. Phila. Hous. Auth.*, 497 F.3d 286, 297 (3d Cir. 2007)).  Similarly, the Third Circuit affords district courts "substantial deference" in the interpretation and enforcement of their local rules.  *United States v. Miller*, 624 F.2d 1198, 1200 (3d Cir. 1980); *accord AntiCancer, Inc. v. Pfizer, Inc.*, 769 F.3d 1323, 1328 (Fed. Cir. 2014) ("A district court's application of its local rules . . . [and] exercise of its disciplinary authority [are] reviewed on the standard of abuse of discretion."); *see also O2 Micro Int'l, Ltd. v. Monolithic Power Sys.*, 467 F.3d 1355, 1366–67 (Fed. Cir. 2006) ("Decisions enforcing local rules in patent cases will be affirmed unless clearly unreasonable, arbitrary, or fanciful; based on erroneous conclusions of law; clearly erroneous; or unsupported by any evidence.").

Defendants cite *Greene v. Virgin Islands Water & Power Authority*, 557 F. App'x 189 (3d Cir. 2014), to argue that a district court is "under no obligation to recognize or analyze" an extraneous filing that "was not properly submitted and did not constitute part of the summary judgment record." *See* 557 F. App'x at 200.  *Greene*, however, is not binding authority and is not analogous to this case.

There, the plaintiff filed a belated affidavit, without leave from the district court, as supplemental opposition to the defendants' motions for summary judgment. *Id.* at 199. In granting the motions for summary judgment, the district court denied the defendants' motion to strike the affidavit without explanation and did not otherwise address the affidavit. *Id.* at 199, 200 n.13. On appeal, the Third Circuit admonished the district court for its "failure to detail its rationale," *id.* at 200 n.13, but concluded that the district court must have treated the affidavit as an extraneous filing outside of the summary judgment record and thus declined to consider it, *id.* at 200.

Two features distinguish this case from *Greene*. First, at the summary judgment hearing, the district court here explicitly asked about the termination of the license agreement and whether the license agreement had been replaced, suggesting that the district court viewed the termination as irrelevant. Second, unlike the belated filing in *Greene*, Evolved filed its notice promptly after being informed of the termination by counsel for LGE.[5]

To the extent we can glean anything from the record regarding Evolved's notice, it appears that the district court declined to consider the termination because the court assumed that the license agreement must have been replaced:

> THE COURT: [The agreements] were terminated, but weren't they replaced then?

---

[5]     In *Greene*, the plaintiff submitted this affidavit forty-two days after the close of summary judgment briefing, though it apparently could have been presented to the district court earlier. *See* 557 F. App'x at 198–200 (characterizing affidavit as "belatedly submitted" and filed without "the District Court's permission to belatedly supplement [the plaintiff's] opposition").

> MR. LARUS: There is no evidence that they were replaced. . . .What that declaration said is that there were ongoing negotiations of whether to replace those agreements with something, but those were terminated.
>
> THE COURT: But they were replaced, weren't they?
>
> MR. LARUS: No.
>
> THE COURT: There's no evidence?
>
> MR. LARUS: There's no evidence they were replaced.
>
> THE COURT: That's complete nonsense. They had to have been replaced. Qualcomm wouldn't sell you their technology unless they're covered with the licenses . . . .

J.A. 4726–27 (transcript of summary judgment hearing); *see also* J.A. 4730 (district court asking Evolved, "When do you think the 1993 agreement ended?").

We have no occasion to decide now whether it was an abuse of discretion to disregard this after-arising evidence; we instead vacate the summary judgment order insofar as it applies to conduct that occurred after the purported termination of the license agreement on December 31, 2018, and remand for further proceedings. On remand, the district court should address whether—and why or why not—it considers Evolved's proffered evidence of the termination part of the summary judgment record. If the district court concludes that the termination issue was properly raised, the district court should conduct further proceedings as necessary to determine whether a termination occurred, and if so, the effect on the license and Evolved's claims of infringement for the post-termination period.

CONCLUSION

We affirm the district court's judgment of noninfringement as it pertains to conduct that occurred on or before December 31, 2018. We vacate the district court's judgment as to any activity occurring on or after January 1, 2019, and remand for further proceedings consistent with this opinion.

**AFFIRMED IN PART, VACATED IN PART, AND REMANDED**

COSTS

Costs to neither party.