Filed 06/21/23  Vanlaw Food Products v. New England Country Foods CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| VANLAW FOOD PRODUCTS, INC., | |
| Plaintiff and Appellant, | G060848 |
| v. | (Super. Ct. No. 30-2017-00962844) |
| NEW ENGLAND COUNTRY FOODS, LLC, | O P I N I O N |
| Defendant and Respondent. | |

Appeal from a judgment of the Superior Court of Orange County, Robert J. Moss, Judge.  (Retired judge of the Orange Super. Ct. assigned by the Chief Justice pursuant to art. VI, § 6 of the Cal. Const.)  Affirmed.

Magarian & DiMercurio, Mark D. Magarian and Krista L. DiMercurio for Plaintiff and Appellant.

M.K. Hagemann and Michael K. Hagemann for Defendant and Respondent.

## INTRODUCTION

While the law recognizes oral and implied contracts, this case demonstrates the wisdom of getting everything down in writing. The parties herein are packaged food companies who entered into a business relationship but left many of the details inchoate, even after operations began. Then, almost two years into the relationship, they formalized their agreement in a signed writing. The trial court sifted through voluminous documents and heard conflicting testimony regarding the agreement's terms before determining the appellant breached it. We affirm.

## FACTS

Respondent New England Country Foods, LLC (NECF) is the successor to Vermont Country Foods, a premium packaged food company started in 1994 by entrepreneur Milton Peter Thomson (who goes by his middle name Peter) and his partners. Thomson had been in the packaged consumer goods industry for over 20 years by that time, and had successfully formed, run, and sold a marketing agency as well. In 1998, Vermont Country Foods developed a premium barbecue sauce which caught the eye of grocery giant Trader Joe's. The sauce, now christened "TJ's Bold & Smoky Kansas City Style Barbecue Sauce," hit Trader Joe's shelves in 1999, on its way to becoming one of the most popular barbecue sauces in the country.

Vermont Country Foods initially produced the barbecue sauce in its own Vermont manufacturing facility, but that changed around the mid aughts. In 2005, Thomson and partners formed NECF to take over Vermont Country Foods' business operations. NECF outsourced the manufacturing to a company called Blossom Valley Foods, located in Gilroy. In late 2013, Blossom Valley Foods indicated it would no longer be able to produce the sauce to NECF's requirements. Thomson then approached appellant VanLaw Food Products, Inc. (VanLaw) to transition manufacturing operations there. His main point of contact at VanLaw was John Gilbert, the company's vice president of sales and marketing and later president.

2

The two companies signed a mutual nondisclosure agreement to protect proprietary information in December 2013, marking the beginning of their business relationship. Thomson visited VanLaw's Fullerton facility in January 2014, and on January 31, 2014, informed Trader Joe's that production was officially being moved from Blossom Valley Foods to VanLaw.

The deal was as follows: Van Law would produce the sauces in 20-ounce bottles, packed into cases by the dozen. The sauce would be produced turnkey, meaning VanLaw would acquire everything required to produce and deliver the sauce to NECF as a finished product ready for sale. The bottles would be stamped with paper labels and would be delivered "FOB Van Law."[1] For each case of sauce, NECF would pay VanLaw $14.50 within 30 days.

Initially, Trader Joe's paid NECF for the barbecue sauce, and NECF then cut a check to VanLaw. But in June 2014, at Trader Joe's behest, and with both parties' consent, the purse strings shifted from NECF to VanLaw. Trader Joe's began issuing purchase orders directly to VanLaw – and paying VanLaw directly as well. Because of this new protocol, the payment terms shifted between VanLaw and NECF. VanLaw agreed to pay NECF its cut via a royalty of $3.30 on every payment VanLaw received from Trader Joe's.[2] VanLaw's royalty checks were accompanied by backup calculations.

From the early days of the royalty arrangement, the parties had discussed certain potential adjustments to the royalty. They agreed that 50 cents could be subtracted per case for an additional cost associated with using pressure-sensitive labels on the bottles instead of paper ones.[3] And another 3.7 cents per case could be subtracted

---

[1]     "FOB" is an abbreviation for "freight on board," or the point of pickup. Thus, "FOB Van Law" meant the sauce would be picked up at VanLaw's Fullerton plant.

[2]     This figure was based on the normal profit NECF was earning in selling the sauce directly to Trader Joe's for $17.80 per case.

[3]     These labels were necessary because of Trader Joe's requirements for the design of the bottle label. Paper labels are a thinner stock and glue must be applied to them on the assembly line. In contrast, pressure-sensitive labels are thicker and come with glue pre-applied. Both parties agreed Trader Joe's design would look better on a pressure-sensitive label.

3

to account for an increase in the cost of tomato paste, a critical ingredient in NECF's barbecue sauce. Thomson testified that this so-called "tomato paste upcharge" would only last for one crop year, a point Gilbert disputed.[4]

The parties did not formalize the royalty arrangement in a signed writing until October of 2015, when Thomson and Gilbert executed an operating agreement made retroactive to January 1, 2015. The operating agreement appears to have been more a by-product of the parties' negotiations over a low-cost sriracha sauce which NECF asked VanLaw to develop in April 2015 for sale in prison commissaries in Texas. Nevertheless, it contained important terms regarding the barbecue sauce arrangement.[5]

The agreement, which was to last for a term of three years, called for a $3.30 royalty per 12 unit case "based on a sell price of $17.80 per case 'FOB' [VanLaw's] Fullerton plant." Royalties on each case accrued as of the day of shipment to Trader Joe's, and NECF was due to be paid by the end of the month after VanLaw received payment.

The agreement also required the parties to make "best efforts" to "negotiate price increase(s) with Trader Joe's as justified by continued increases in input costs," with the "benefit of said price increases" to "accrue to the benefit of both Parties by mutual agreement." Further, the parties agreed that pricing would be reviewed on a quarterly basis. The price could be adjusted "based on documented raw, packaging, freight or operational changes, as mutually agreed to," and any such adjustment could potentially alter the royalty "as agreed to quarterly." Amendments to the agreement could be made "[o]nly in writing signed by all parties[.]"

---

[4] As a practical result, neither side disputes the tomato paste upcharge of 3.7 cents per case was proper at least for all royalties issued between July 1, 2014 and June 30, 2015 – the extent of the single crop year following initiation of the royalty arrangement.

[5] While disputes arose over the parties' sriracha sauce relationship also, VanLaw seeks only to reverse the trial court's findings respecting the barbecue sauce.

4

This lawsuit was initiated by VanLaw in December of 2017 when it sought damages from NECF because of excess raw materials it purchased to make sriracha sauce for which NECF was unable to provide orders. But this appeal pertains to the cross-complaint NECF filed in February 2019 for improprieties it claimed occurred in royalty calculations on the barbecue sauce. Specifically, NECF alleged that VanLaw improperly continued to deduct for the tomato paste upcharge long after the end of the 2014-2015 crop year. It further alleged VanLaw had improperly deducted 26 cents per case as a fulfillment fee.

After a bench trial, the trial court issued a statement of decision finding in favor of VanLaw on its complaint related to the sriracha sauce, but in favor of NECF on its cross-complaint pertaining to the barbecue sauce. The trial court concluded that VanLaw breached the agreement when it made the deductions since the operating agreement did not expressly allow for them, and a signed writing was required for any such deduction to be permissible. But because NECF conceded as to the limited-term tomato paste upcharge and pressure-sensitive label charge, the trial court awarded $115,571.31 in back royalties only as to the fulfillment fees and any tomato paste upcharges occurring after the 2014-2015 crop year.

## DISCUSSION

**I.          NECF's Motion to Dismiss the Appeal**

We first consider NECF's contention that VanLaw's appeal should be dismissed because VanLaw has already voluntarily accepted the benefits of the trial court's judgment. Some procedural background is required to assess the motion.[6]

Several months before the bench trial in this matter, NECF sought leave to amend its cross-complaint in order to add allegations about VanLaw's attempts to clone

---

[6]     In order to do so, we grant NECF's request for judicial notice of the federal court filings in *New England Country Foods, LLC v. VanLaw Food Prods., Inc*. (C.D.Cal. 2022) 2022 U.S.Dist. LEXIS 109555 (case No. 8:21-cv-01060-DOC-ADS).

5

NECF's proprietary barbecue sauce and create a competing relationship with Trader Joe's. NECF contended this information was obtained in discovery, although it appears the motion was prompted by a change in strategy. With VanLaw opposing leave to amend the cross-complaint, the trial court denied NECF's motion, so NECF pursued these allegations by way of a separate lawsuit in federal court.

VanLaw filed a motion to dismiss the federal action, arguing in part that the case was barred by res judicata or claim preclusion because trial had already occurred in this matter. The federal district court rejected VanLaw's claim and issue preclusion argument, but granted its motion to dismiss based on the existence of a limitation of liability clause in the parties' agreement. Indeed, the federal court rejected the claim preclusion argument specifically because VanLaw had chosen to pursue this appeal. The federal court's ruling was issued on November 23, 2021, not two weeks after VanLaw filed the notice of appeal herein.

In this motion, NECF makes four arguments in favor of dismissing VanLaw's appeal. First, it claims VanLaw sought the benefits of the judgment by way of its motion to dismiss while also seeking the right to modify or vacate it. Second, it contends VanLaw should be judicially estopped from appealing based on the inconsistent position it took in the federal case. Third, it argues VanLaw made binding admissions to the federal court about the finality of the judgment. Finally, it urges us to dismiss the appeal based on unclean hands. We are not persuaded by any of these arguments.

A.	**Voluntary Acceptance of Benefits**

"It is the general rule that the voluntary acceptance of the benefit of a judgment or order is a bar to the prosecution of an appeal, since the right to accept the fruits of the judgment and the right to appeal therefrom are wholly inconsistent, and an election to take one is a renunciation of the other. [Citations.] An exception to the general rule exists where the appellant is concededly entitled to the benefits which are accepted and a reversal will not affect the right to those benefits." (*Mathys v. Turner*

6

(1956) 46 Cal.2d 364, 365.)  However, as we have stated, acceptance of the benefit must be "'clear, unmistakable, and unconditional [citation.]'" (*Satchmed Plaza Owners Assn. v. UWMC Hospital Corp.* (2008) 167 Cal.App.4th 1034, 1041-1042.)

At the same time, "'[i]t is a well established policy that, since the right of appeal is remedial in character, our law favors hearings on the merits when such can be accomplished without doing violence to applicable rules.  Accordingly in doubtful cases the right to appeal should be granted.' [Citations.]" (*Lee v. Brown* (1976) 18 Cal.3d 110, 113.)

In essence, NECF asserts VanLaw cannot argue claim preclusion by operation of a judgment it is concurrently appealing.  But VanLaw was not actually appealing the ruling when it filed its motion to dismiss the federal lawsuit in August 2021.  Indeed, there was no ruling to appeal until one month later.  This appears to be one of those "doubtful cases" in which we must avoid cutting off an appeal on the merits.  A party must be given at least a little latitude to aggressively defend one case while contemplating the appeal of another, even if it is related.

### B.     Judicial Estoppel

We also decline to apply judicial estoppel.  The doctrine prevents a party from asserting a position in one case that is inconsistent from the position taken in another case, whether or not the position is the subject of a final judgment.  (See *Jackson v. County of Los Angeles* (1997) 60 Cal.App.4th 171, 182.)  It "applies when '(1) the same party has taken two positions; (2) the positions were taken in judicial or quasi-judicial administrative proceedings; (3) the party was successful in asserting the first position (i.e., the tribunal adopted the position or accepted it as true); (4) the two positions are totally inconsistent; and (5) the first position was not taken as a result of ignorance, fraud, or mistake.' [Citations.]" (*Aguilar v. Lerner* (2004) 32 Cal.4th 974, 986-987.)  VanLaw was not successful in asserting its claim preclusion argument in the federal court, thus application of judicial estoppel is inappropriate.

7

### C. Judicial Admission

Similarly, NECF claims VanLaw made a judicial admission as to the finality of the judgment.  We disagree because judicial admissions are almost universally admissions of fact.  (*Myers v. Trendwest Resorts, Inc.* (2009) 178 Cal.App.4th 735, 746.)  Whether or not the judgment of the trial court was final is an issue of law.

### D. Unclean Hands

This equitable defense is applied in cases in which a plaintiff has engaged in bad faith conduct directly relating to the claims at issue.  (See *Kendall-Jackson Winery, Ltd. v. Superior Court* (1999) 76 Cal.App.4th 970, 979.)  But its application "'depends on the analogous case law, the nature of the misconduct, and the relationship of the misconduct to the claimed injuries.'  [Citation.]" (*Aguayo v. Amaro* (2013) 213 Cal.App.4th 1102, 1110.)  NECF provides citations to no analogous case law in which the defense was applied to dismiss an appeal.

## II. VanLaw's Appeal

Having decided to review the trial court's decision on its merits, we find no reversible error.  VanLaw argues the operating agreement did not require the contested deductions to be in writing.  Further, it asserts the trial court lacked substantial evidence to conclude the deductions were unauthorized and therefore a breach of contract.

### A. The Parties' Agreement

Central to our inquiry is an understanding of the scope and terms of the parties' agreement.  Was the operating agreement the exclusive delineation of the royalty arrangement's terms?  Or was there other evidence defining them?  And depending on the answer to the previous questions, what deductions were ultimately permissible?

"Contract interpretation 'is essentially a judicial function to be exercised according to the generally accepted canons of interpretation so that the purposes of the instrument may be given effect. [Citations.]'  [Citation.]  In interpreting a contract, the court considers the language of the contract, the circumstances under which the parties

negotiated or entered into the contract, the object, nature and subject matter of the contract, and the subsequent conduct of the parties. (*Morey v. Vannucci* (1998) 64 Cal.App.4th 904, 912.)" (*Kitty-Anne Music Co. v. Swan* (2003) 112 Cal.App.4th 30, 37.)

When dealing with a written contract, we must first independently determine whether the writing is ambiguous. If it is ambiguous, extrinsic evidence can be considered as to the writing's meaning, and if the trial court's interpretation of the writing "rests on its resolution of conflicting evidence, 'any reasonable construction will be upheld as long as it is supported by substantial evidence.' [Citation.]" (*Thompson v. Asimos* (2016) 6 Cal.App.5th 970, 986.) But some cases, like this one, require us to determine whether the writing is itself a complete expression of the parties' agreement. This is also a question of law. (See *Heffner v. Gross* (1919) 179 Cal. 738, 742.)

The record and briefing leave us convinced the parties, and consequently the trial court, lacked a clear understanding of what constituted the agreement. VanLaw says royalty deductions did not need to be in writing; indeed, it claims the deductions were not modifications at all, but rather, terms to which Thomson either agreed or acquiesced from the get go. NECF, on the other hand, contends the deductions were modifications requiring a writing, and if the parties agreed to them orally, the requirement of a writing would have to have been waived – which, they note, was not an argument made before the trial court. This left the trial court unenviably in the position of trying to enforce as best it could what it discerned to be the intentions of the parties.

But an important fact went unnoticed: the operating agreement was not actually effective until January 2015, almost a year *after* NECF decided to move its production to VanLaw, and nearly six months after the royalty arrangement began. Why is this important? Because for almost six months, no written contract governed the relationship, which means for that period of time, the parties' contract was a mixture of terms or desires communicated and accepted either orally or in writing, and conduct implying agreement. *Those* terms require examination.

9

This is especially so because the operating agreement itself contains no language of integration; nothing to indicate the document executed in October 2015 contains all agreed-upon terms. The trial court should have considered collateral evidence to interpret its terms, including the parties' conduct and the surrounding circumstances. (See *Brawthen v. H & R Block, Inc.* (1972) 28 Cal.App.3d 131, 137.) To the extent the parties' words or conduct in 2014 and 2015 indicated certain deductions could be made, those deductions must be enforced, whether in writing or not.

## B.     The Deductions

With this backdrop, we can discern a certain logic behind NECF's choice to pursue certain deductions in this litigation while conceding others.[7] In January 2014, before their first run, Thomson indicated to Gilbert that NECF would be willing to absorb the cost of pressure-sensitive labels for the time being because Thomson was hoping to get Trader Joe's permission to switch to the paper labels. Clearly, such permission was never granted, and so it was only fair for NECF to take the hit. Similarly, Gilbert had stressed repeatedly to Thomson, beginning in June 2014, that VanLaw was paying significantly higher prices for tomato paste than normal. He was asking for help to absorb some of the shock. Thomson appears to have understood VanLaw did not control the price of wholesale tomato paste; hence his continued monitoring of the agricultural data. And in September 2015, he asked Gilbert to remove the upcharge effective in August 2015. This implies he was amenable to paying it up until the August 2015 timeframe, when he felt conditions had fairly improved, and he communicated the same to VanLaw.

So, NECF's concession on the two aforementioned deductions was apropos. The 26-cent fulfillment fee is a different story. There is no evidence in the record that NECF ever agreed to pay any fulfillment fee to VanLaw. The first time a

---

[7]     VanLaw implies that NECF's decision to concede the temporary tomato paste upcharge and pressure-sensitive label deduction is hypocritical if the operating agreement does not allow deductions at all.

10

fulfillment fee appears in any of the royalty backup documentation is November of 2014, showing the fee was being charged retroactive to June of that year. When the parties first began talking in January 2014, the plan was for NECF to pay VanLaw $14.50 for the production of the sauce. No additional fee would have been required. When the royalty arrangement began in mid-2014, Gilbert notified Thomson that the new arrangement would be more costly on VanLaw's end than a "straight copacking arrang[e]ment." He wanted them to discuss it, but it does not appear the parties ever agreed on how to handle the issue. In a July 29, 2014 e-mail, Thomson claimed VanLaw "only recently communicated to NECF" about the fulfillment charge. And he suggested NECF might have chosen to handle things differently had he known such a fee would be assessed.

Van Law argues NECF continued to accept royalty payments minus the deductions. As a result, it contends, the deductions were accepted and authorized pursuant to the parties' course of dealing, citing *Southern California Acoustics Co. v. C.V. Holder, Inc.* (1969) 71 Cal.2d 719, 722 (*Holder*). *Holder* states "[s]ilence in the face of an offer is not an acceptance, unless there is a relationship between the parties or a previous course of dealing pursuant to which silence would be understood as acceptance." (*Ibid.*) The problem with VanLaw's argument is twofold. First, there was no evidence the parties ever agreed silence would constitute acceptance. But second, VanLaw seems to concede that Thomson and Gilbert were under differing impressions as to what the 26-cent fee covered. In its opening brief, it states Thomson believed the fulfillment fee was for freight, whereas Gilbert understood it to be a number of costs associated with fulfilling orders. If the two sides didn't even agree as to what the fee *was*, we can hardly say the trial court lacked substantial evidence to find it unauthorized.

We also cannot help but notice the operating agreement contains specific language that would allow the parties to adjust both the sale price to Trader Joe's and the royalty payable to NECF as necessitated by conditions. But the parties would have to mutually agree to such changes. And to add adjustments necessary as a result of

11

increased input costs on VanLaw's end, it would need to document such costs. There is no evidence the increased costs were documented, aside from being mentioned in e-mail correspondence. This is another indication the fulfillment fee was unauthorized.

In sum, we think the evidence supports the trial court's judgment.

## DISPOSITION

Respondent's motion to dismiss the appeal is denied. The judgment is affirmed. Respondent is to recover its costs on appeal.


BEDSWORTH, ACTING P. J.

WE CONCUR:


MOORE, J.


DELANEY, J.