Filed 9/20/21

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| DOTCONNECTAFRICA TRUST, | B302739 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. BC607494) |
| v. | |
| INTERNET CORPORATION FOR ASSIGNED NAMES AND NUMBERS, | |
| Defendant and Respondent; | |
| ZA CENTRAL REGISTRY, NPC, | |
| Intervener and Respondent. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Robert B. Broadbelt, III, Judge.  Affirmed.

Dechert, Arif H. Ali, Anna Q. Do and Michael H. McGinley for Plaintiff and Appellant.

Jones Day, Jeffrey A. LeVee, Erin L. Burke, Erica L. Reilley and Erna Mamikonyan for Defendant and Respondent.

Kesselman Brantly Stockinger, David W. Kesselman, Amy T. Brantly and Kara D. McDonald for Intervener and Respondent.

———————————

We affirm the trial court's application of judicial estoppel in this case about internet names.

The Internet Corporation for Assigned Names and Numbers, widely known as ICANN, is in charge of internet website names. In this role, ICANN selects entities to handle selling internet names using particular suffixes. ICANN decided to expand the online universe by creating hundreds of new internet suffixes to supplement existing endings like .org (as in lacourt.org) and .gov (as in courts.ca.gov). One of ICANN's proposed new suffixes was .africa. The chosen registrant would be able to sell internet names using this suffix. A fanciful name example would be example.africa.

Two organizations applied for the .africa name rights. One was DotConnectAfrica Trust, which we shorten to DotConnect. The other was ZA Central Registry, NPC, which we call ZA.

Representatives of more than 150 nations and international organizations advised ICANN against awarding the .africa rights to DotConnect. ICANN took this advice, rejected DotConnect, and selected ZA.

DotConnect appealed to ICANN's internal dispute resolution program, which resulted in a two-year arbitration.

DotConnect told the arbitrators they should grant it seven procedural advantages during the arbitration—advantages like interim relief and an independent standard of review. DotConnect's argument to the arbitrators was, when it applied to ICANN for .africa, DotConnect had waived its right to sue

ICANN in court, and this waiver meant it was only fair that DotConnect enjoy these procedural advantages during the arbitration. The arbitrators accepted DotConnect's arguments and gave DotConnect the advantages it sought.

The arbitrators did not award the .africa name to DotConnect. Rather the arbitrators ruled ICANN should put DotConnect back in the contest by resuming consideration of DotConnect's application at the stage where ICANN had left off.

ICANN complied with the arbitrators' order and resumed considering DotConnect's application. ZA, however, continued to have the backing of the African Union Commission and apparently of all 55 nations the African Union recognizes. The past support for DotConnect was no longer current. ICANN ultimately rejected DotConnect and awarded ZA the rights to .africa.

DotConnect declined to seek arbitral review of this new ICANN decision. Rather it sued ICANN in Los Angeles Superior Court. The trial court held a bench trial and ruled against DotConnect on grounds of judicial estoppel.

DotConnect appealed. The respondents are ICANN and ZA.

We affirm. DotConnect has estopped itself from suing in court by convincing ICANN's arbitrators DotConnect could not sue in court.

## I

The facts span continents and decades.

## A

We begin with the parties: DotConnect, ZA, and ICANN.

3

1

DotConnect is a nonprofit organization founded under the laws of Mauritius with a principal place of business in Kenya. Its founder and CEO is Sophia Bekele.

Bekele maintains the website Sophia Bekele, which states, "Bekele travels globally for her work and shuttles regularly between her residences in Walnut Creek, California and Africa, where she has a firm based in business and family." (Sophia Bekele, Biography <https://sophiabekele.com/biography/> [as of Sept. 15, 2021], archived at <https://perma.cc/2QCF-D5M2>.) Bekele was born in Ethiopia and moved to the U.S. when she was 16. At the time of trial, Bekele had had a home in Northern California for about 20 years. At oral argument, the parties described Bekele as a person of achievement.

2

ZA is, according to DotConnect, a proxy applicant for the African Union Commission. ZA is a party to this case; the African Union Commission is not, but it is central to the controversy.

ZA is a South African nonprofit company with its principal place of business in Midrand, South Africa. Its CEO is Mokgabudi Lucky Masilela. It was originally formed in 1988 under the name UniForum SA to promote open standards in software and hardware. ZA is the largest domain name registry in Africa. At the same time it applied for .africa, ZA applied for, and obtained, .capetown, .joburg, and .durban. ZA has launched these names to the internet public. ZA claims to have a well-known reputation of independence, neutrality, technical competence, and operational excellence.

The African Union Commission is, according to DotConnect, appointed officials who represent African heads of state.  The Commission is the secretariat for the African Union, an intergovernmental organization comprised of the nations of the African continent.  (See African Union, About the African Union <https://au.int/en/overview> [as of Sept. 15, 2021], archived at <https://perma.cc/J2VV-X7ZV>.)

As of 2013, these member states included Algeria, Angola, Benin, Botswana, Burkina Faso, Burundi, Cabo Verde, Cameroon, Central African Republic, Chad, Comoros, Congo, Cote d'Ivoire, Democratic Republic of the Congo, Djibouti, Egypt, Equatorial Guinea, Eritrea, Ethiopia, Gabon, Gambia, Ghana, Guinea, Guinea-Bissau, Kenya, Lesotho, Liberia, Libya, Madagascar, Malawi, Mali, Mauritania, Mauritius, Mozambique, Namibia, Niger, Nigeria, Rwanda, Sahrawi Republic, São Tomé and Príncipe, Senegal, Seychelles, Sierra Leone, Somalia, South Africa, South Sudan, Sudan, Swaziland, Togo, Tunisia, Uganda, United Republic of Tanzania, Zambia, and Zimbabwe.

3

ICANN helps govern the internet.  Its website bears the slogan "One World, One Internet."  (ICANN <https://www.icann.org/en> [as of Sept. 15, 2021], archived at <https://perma.cc/6SSR-U8GK>.)  We sketch ICANN's origin and nature.

First we need some internet basics.  A "domain name" is an internet name like lacourt.org or courts.ca.gov.  The ".org" or ".gov" is the "top-level domain" name.  ICANN is the entity that today establishes what top level domain names can exist and what other entities control the creation of new domain names.

The domain name system evolved as the internet grew from a recondite research curiosity to today's worldwide information system.  ARPANET, the forerunner of the internet, carried its first computer message in 1969.  The message was "lo."  The message was supposed to be "login," but the system crashed after o.  (Wikipedia, ARPANET <https://en.wikipedia.org/wiki/ARPANET> [as of Sept. 15, 2021], archived at <https://perma.cc/T263-C9KX> (ARPANET).)  "As UCLA computer scientist Leonard Kleinrock later put it, the internet had just uttered its first word, *lo*, 'as in "lo and behold." ' "  (Jim Newton, Man of Tomorrow:  The Relentless Life of Jerry Brown (2020) p. 124.)

Elizabeth J. Feinler began a name directory in the 1970s when the ARPANET network was tiny.  (Wikipedia, Elizabeth J. Feinler <https://en.wikipedia.org/wiki/Elizabeth_J._Feinler> [as of Sept. 15, 2021], archived at <https://perma.cc/E2SK-5REV>.)  In mid-1975, for instance, ARPANET connected only 57 computers.  (ARPANET, *supra*.)  As the internet grew, it became increasingly unwieldy to index this directory by hand, so creators invented new ways for assigning internet names.  (See Wikipedia, Internet Assigned Numbers Authority <https://en.wikipedia.org/wiki/Internet_Assigned_Numbers_Authority> [as of Sept. 15, 2021], archived at <https://perma.cc/AG3U-89PW>.)

In the late 1990s, an agency within the U.S. Department of Commerce proposed privatizing the work.  In response, in 1998, ICANN contracted with the Department of Commerce.  (Wikipedia, ICANN <https://en.wikipedia.org/wiki/ICANN> [as of Sept. 15, 2021], archived at <https://perma.cc/TA98-V9EH>.)  ICANN is a nonprofit corporation organized under California law.

It is headquartered in Los Angeles and has offices around the world.  In 2016, ICANN and the Department of Commerce agreed to end governmental oversight of ICANN.  (*Ibid*.; ICANN, Contact <https://www.icann.org/contact> [as of Sept. 15, 2021], archived at <https://perma.cc/SPL9-YYBA>.)

Today, ICANN professes to be a nongovernmental organization serving the global purpose of bringing international stakeholders together to create internet policies.  (See ICANN, Get Started <https://www.icann.org/get-started> [as of Sept. 15, 2021], archived at <https://perma.cc/NW5C-S9YT>.)  Its articles of incorporation direct ICANN to work for the benefit of the internet community as a whole.

ICANN's mission is "to coordinate, at the overall level, the global Internet's system of unique identifiers, and in particular to ensure the stable and secure operation of the Internet's unique identifier systems."  Top-level domain names are among the unique identifiers ICANN coordinates.

The parties agree ICANN now is a self-governing organization operating on a multi-stakeholder policy-making model.  Business interests, government interests, public policy interests, and academics have ICANN representatives.

ICANN has three main parts:
- the ICANN *board*,
- the ICANN *staff*, and
- the ICANN *community*.

We thumbnail these three parts.

The ICANN *board* governs and performs oversight.  It currently has 20 members with backgrounds in more than a dozen countries.  (ICANN, ICANN Board of Directors <https://www.icann.org/resources/pages/board-of-directors> [as of

Sept. 15, 2021], archived at <https://perma.cc/4KVR-KADC>.)  In 2003, the board established a Board Governance Committee, which is a seven-person subset of the 20-person board.  (See ICANN, Board Governance Committee <https://www.icann.org/resources/pages/governance-committee-2014-03-21-en> [as of Sept. 15, 2021], archived at <https://perma.cc/QA3F-GNGQ>.)

The ICANN *staff* now numbers 140 employees.  (ICANN Wiki, ICANN <https://icannwiki.org/ICANN> [as of Sept. 15, 2021], archived at <https://perma.cc/WJZ8-HPS3>.)  A Chief Executive Officer heads the group.

The ICANN *community* includes diverse organizations described in ICANN's bylaws.  Among these are advisory committees like the At-Large Advisory Committee, the Security and Stability Advisory Committee, and—of particular pertinence to this case—the Governmental Advisory Committee.

The Governmental Advisory Committee played an important role in this saga.  It has over 150 members.  The committee is composed of representatives and organizations from around the world.  Members include nations, like Afghanistan, Albania, Antigua and Barbuda, Argentina, and so on.  Other members are intergovernmental organizations like the African Telecommunications Union, the African Union Commission, the Asia Pacific Telecommunity, the Caribbean Telecommunications Union, and so forth.  (See ICANN, About the GAC:  GAC Membership <https://gac.icann.org/about/members> [as of Sept. 15, 2021], archived at <https://perma.cc/3MU2-AETY>.)

The Governmental Advisory Committee's mandate is to consider and advise about ICANN's activities as they relate to concerns of government, particularly where ICANN's policies

may interact with law and international agreements or may affect public policy issues.

The Governmental Advisory Committee is independent of ICANN in the sense that ICANN does not appoint its members; rather, governments and intergovernmental entities apply to the committee for membership.  Neither ICANN staff nor ICANN board members are on the Governmental Advisory Committee.  This committee maintains a website.  (See ICANN, About the GAC <https://gac.icann.org/about> [as of Sept. 15, 2021], archived at <https://perma.cc/6PBK-US6M>.)

DotConnect takes a partisan and negative view of the Governmental Advisory Committee, which advised against DotConnect in this case.  DotConnect argues the Committee's membership "is unregulated and open to 'national governments and distinct economies as recognized in international fora,' which makes it an exceedingly political body."  DotConnect charged the Committee has no distinct rules, limited public records, fluid definitions of membership and quorums, and unfair procedures.

There has been no general judicial or arbitral validation of DotConnect's indictments, but the arbitrators in this case were critical of the opaque nature of the Committee's decisionmaking.  They ruled this opacity was inconsistent with ICANN's internal commitment to transparency.  We will describe this arbitral finding in more detail.  But first we relate the origin of the rivalry for .africa between DotConnect and ZA.

B

We recount DotConnect's and ZA's competition for the .africa name.  For clarity, we split the contest into five phases: (1) the dispute in Africa; (2) events at ICANN; (3) the arbitration; (4) ICANN's response to the arbitration; and (5) the case in court.

9

1

The dispute began in Africa.

According to Bekele, in 2006 she conceived the idea for the .africa name. She thought there should be such a continental name to correspond with existing suffixes like .asia for Asia. The .africa project became her "personal dream." Bekele created DotConnect in 2008 to pursue rights to the .africa suffix.

DotConnect approached the African Union Commission for support. According to Bekele, before she arrived, none of the Commission's officials was aware of the possibility of .africa. Nobody there knew about ICANN before Bekele told them about it.

The African Union Commission's initial position was to side with Bekele. On August 27, 2009, the chair of the African Union Commission wrote to support DotConnect's plan to seek the .africa name from ICANN.

This support, however, was short lived: Bekele's initiative triggered competition. According to her, "As soon as it became more widely known within the African Internet community that the [African Union Commission] was interested in supporting [DotConnect's] initiative to apply for a .AFRICA [top level domain name], however, other parties recognized the potential for .AFRICA and began to vie for the [African Union Commission's] support."

Bekele was "troubled by the lengths" some of her competitors went to in their efforts to discredit DotConnect.

Bekele's competitors evidently outmaneuvered her. On April 16, 2010, the African Union Commission withdrew its support for DotConnect and, in Bekele's view, became her rival.

10

The African Union Commission revoked its endorsement of DotConnect in favor of what it called an open selection process to identify an applicant the Commission would back. Bekele interpreted this to mean the Commission would identify and select its own proxy, which would not be DotConnect.

Bekele said the African Union Commission's 2010 reversal was "shocking" to her. She protested the reversal, writing that the endorsement was "unfairly withdrawn." Bekele insisted the original endorsement by the African Union Commission "remains valid." Bekele wrote she was the victim of a "conspiracy" and a "secret cabal."

From 2010 through to this appeal, Bekele has continued to deny the validity of the African Union Commission's 2010 reversal. In her opening appellate brief, for instance, DotConnect continues to treat the African Union Commission's 2009 letter as though it remains in effect, despite the 2010 reversal.

The African Union Commission's 2010 selection process requested proposals. DotConnect boycotted the process, claiming the African Union Commission had predetermined its outcome—a claim that no independent body has substantiated. In another unsubstantiated accusation, Bekele said this ostensibly open competition was merely a "sham."

ZA, however, did respond to the African Union Commission's request for proposals. ZA maintains the open bid process was legitimate, there was no fraud or conspiracy between ZA and the African Union Commission, and ZA competed fairly at all times. No independent body has validated these claims either.

As the lone applicant, ZA prevailed.

ZA now had the African Union Commission's backing to apply to ICANN; DotConnect had lost this backing.

ZA and DotConnect both went to work preparing their applications to ICANN.

2

We shift from Africa to ICANN.

ICANN decided to expand the number of available internet names and so created its "New gTLD Program." (The acronym "gTLD" stands for "generic top-level domain" name.) ICANN spent years planning for this wide-ranging name expansion. Bekele and many other ICANN participants provided feedback during this planning stage.

ICANN created a committee to manage the process of creating and assigning these new names. According to ICANN's website, in 2012 its board established the New gTLD Program Committee and delegated decisionmaking authority for activities related to the New gTLD Program to this committee. (ICANN, New gTLD Program Committee <https://www.icann.org/resources/pages/new-gtld-program-committee-2014-03-21-en> [as of Sept. 15, 2021], archived at <https://perma.cc/4UQA-X86C>.)

In June 2012, ICANN published a 300-page guidebook for applicants to ICANN's new program. Ultimately this program would result in 1,200 new top-level domain names, like .shop and .osaka. .Africa was to be one of these new names.

ICANN set criteria for geographic names like .africa. The successful applicant had to have the backing of 60 percent of the governments in the geographic region. ICANN sought to give pertinent governments a say in the process and to require

12

applicants to garner more than majority support for any specific application.

ICANN invited interested parties to apply to become the "registry operator" for the new generic top-level domain names ICANN was proposing. ICANN required applicants to agree to a release and to covenant not to sue ICANN. This litigation waiver would become important later on.

Once designated a registry operator, a party then would have the right to sell subscriptions to consumers for domain names within the generic top-level domain name. This is the right DotConnect and ZA sought to win from ICANN. According to DotConnect, the right to control a top-level domain is "highly valuable commercially."

DotConnect applied to ICANN in March 2012, and ZA applied in June 2012.

As we have seen, ZA had the African Union Commission's current support. DotConnect had the Commission's defunct 2009 support, which the Commission had revoked in 2010.

DotConnect continued to ignore the 2010 revocation and to insist the African Union Commission still supported DotConnect. DotConnect took a similar stance about the United Nations Economic Commission for Africa, despite the fact this entity said it was "not qualified to issue a letter of support for a prospective applicant" to ICANN.

Bekele protested to ICANN that two of its board members—Mike Silber and Chris Disspain—had disqualifying conflicts of interest. ICANN's Ombudsman Chris LaHatte rejected this protest.

In April 2013, ICANN's Governmental Advisory Committee met in Beijing, China to consider a range of matters. In its so-

13

called Beijing Communiqué of April 11, 2013, the Governmental Advisory Committee wrote to ICANN with advice affecting dozens of applications. (Available at <https://gac.icann.org/advice/itemized/2013-04-11-obj-africa> [as of Sept. 15, 2021], archived at <https://perma.cc/SQ8V-2TSR>; and <https://www.icann.org/en/system/files/correspondence/gac-to-board-11apr13-en.pdf> [as of Sept. 15, 2021], archived at <https://perma.cc/C5ML-7JF4>.)

One item of the Governmental Advisory Committee's consensus advice was that ICANN should not proceed with DotConnect's application.

The Committee's advice was summary and unelaborated: "The [Governmental Advisory Committee] advises ICANN that it is the consensus of the [Governmental Advisory Committee] that a particular application should not proceed." Context showed "a particular application" was DotConnect's application.

The Committee provided no rationale or explanation for its advice. The chairperson of the Governmental Advisory Committee later would describe the situation as "creative ambiguity": "We leave things unclear so we don't have conflict."

DotConnect objected to the Governmental Advisory Committee's Beijing decisionmaking, charging it was the result of irregularities and conflicts of interest.

On June 4, 2013, ICANN's New gTLD Program Committee posted a notice accepting the Governmental Advisory Committee's advice to stop processing DotConnect's application. In June 2013, ICANN's board voted to adopt the advice of the Governmental Advisory Committee. As a result, the ICANN staff told DotConnect ICANN had stopped processing its application.

14

On July 2, 2013, the African Union and the African Union Commission wrote to ICANN in support of ZA's predecessor entity. This letter stated the African Union Commission "represents the interests and support of 54 African governments." Morocco wrote separately to support ZA's corporate predecessor.

The African Union Commission specifically objected to DotConnect's application. Sixteen individual African nations filed similar protests against DotConnect with ICANN.

This apparently meant all 55 nations in Africa supported ZA's application to ICANN for the .africa name. None supported DotConnect.

DotConnect requested reconsideration by the ICANN Board Governance Committee, which denied this request on August 1, 2013.

Bekele thought ICANN's rejection of DotConnect's application was unfair. She named people she said had been involved in the .africa decision process who, according to Bekele, had acted with conflicts of interest, had acted inappropriately or unethically, or had discharged their duties unsatisfactorily. These people included:

- Anne-Rachel Inné ("inappropriately and unethically"),
- Pierre Dandjinou (part of a "contrived" agenda),
- Moctar Yedaly ("attempted to recant" endorsement),
- Nii Quaynor ("deeply conflicted"),
- Alice Munyua ("very inappropriate for her to be involved"),
- Chris Disspain ("might be deeply conflicted"),
- Mike Silber ("inappropriate and unethical"),
- Chris LaHatte ("inappropriate"), and

15

- Alain Pellet ("very inappropriate," "terribly inappropriate," "completely inappropriate").

Bekele and DotConnect sought arbitral review of ICANN's decision.

## 3

The next phase was a two-year international arbitration, which ICANN terms its Independent Review Process. ICANN's website and bylaws do not label this process an "arbitration," but the arbitrators ruled it an arbitration in all but name. We use the name: arbitration.

### a

DotConnect initiated the arbitration in October 2013. The International Centre for Dispute Resolution, which is the international division of the American Arbitration Association, conducted the process.

The Independent Review Panel had three arbitrators. Each party selected one. The International Centre for Dispute Resolution selected the third.

DotConnect chose Dr. Catherine Kessedjian, the Deputy Director of the College of Paris, Professor of Law, and the former Deputy Secretary General of the Hague Conference on Private International Law.

ICANN picked Richard C. Neal, a retired California Court of Appeal justice. When Neal passed away, ICANN replaced him with William Cahill, a retired California Superior Court judge.

The International Centre for Dispute Resolution selected Babak Barin, an experienced Canadian commercial litigator and arbitrator, to chair the panel.

This arbitration included discovery, briefing, the exchange of witness declarations, and a series of interim orders. It

16

involved a two-day transcribed hearing at which three live witnesses testified under oath. The arbitration culminated in a 63-page final ruling on July 9, 2015.

In this arbitration, DotConnect won seven procedural victories and two substantive victories, which we describe.

b

DotConnect's procedural victories were on the following contested points.

i. The arbitrators stayed ICANN's assignment of .africa during the arbitration.
ii. DotConnect was awarded extensive document discovery.
iii. DotConnect was granted live witness testimony.
iv. DotConnect was entitled to supplemental briefing.
v. The arbitrators declared their ruling was binding on ICANN.
vi. The standard of review of ICANN's decisionmaking was de novo.
vii. As the prevailing party, DotConnect won a cost award against ICANN. This award was $198,046.04, which ICANN paid to DotConnect.

During the arbitration, DotConnect repeatedly told the arbitrators it had signed an extensive and binding waiver that barred all recourse to courts, and therefore the panel should grant DotConnect these seven procedural benefits.

The panel accepted DotConnect's arguments. (The second italics are ours.)

"The [Independent Review Panel] is the only independent third party process that allows review of board actions to ensure their consistency with the Articles of Incorporation or Bylaws. . . .

17

[T]he avenues of accountability for applicants that have disputes with ICANN do *not* include resort to the courts. Applications for gTLD delegations are governed by ICANN's Guidebook, which provides that applicants *waive all right* to resort to the courts . . . ."

c

DotConnect won two arbitral victories on the merits.

i

First, the arbitrators disapproved of ICANN's decisionmaking. The panel ruled ICANN, rather than having merely deferred to the Governmental Advisory Committee's advice, should have investigated the matter further.

The arbitrators explained the basis for this ruling. The Governmental Advisory Committee "did not act with transparency or in a manner designed to insure fairness." The arbitrators said the Governmental Advisory Committee apparently "made its decision without providing any rationale and primarily based on politics and not on potential violations of national laws and sensitivities." Then ICANN's New gTLD Program Committee merely accepted the Governmental Advisory Committee's unexplained advice. DotConnect moved for reconsideration of the New gTLD Program Committee's decision, but the Board Governance Committee recommended to the New gTLD Program Committee that it deny DotConnect's request for reconsideration. On August 13, 2013, the New gTLD Program Committee accepted the Board Governance Committee's recommendation without further consideration.

A flaw, according to the arbitrators, was that ICANN's founding documents required the Board Governance Committee to conduct a "meaningful review" of the New gTLD Program

18

Committee's decision to accept the advice of the Governmental Advisory Committee.

This point, "combined with the fact that [DotConnect] was never given any notice or an opportunity in Beijing or elsewhere to make its position known or defend its own interests before the [Governmental Advisory Committee] reached consensus on the [Governmental Advisory Committee's] Objection Advice, and that the Board of ICANN did not take any steps to address this issue, leads this [Arbitration] Panel to conclude that both the actions and inactions of the Board with respect to the application of [DotConnect] relating to the .AFRICA gTLD were not procedures designed to insure the fairness required by [ICANN] Article III, Sec. 1 above, and are therefore inconsistent with the Articles of Incorporation and Bylaws of ICANN."

The bottom line for the arbitrators was that "both the actions and inactions of the Board with respect to the application of [DotConnect] relating to the .AFRICA gTLD were inconsistent with the Articles of Incorporation and Bylaws of ICANN."

In a nutshell, the arbitrators decided the Beijing Communiqué was too summary to be consistent with ICANN's commitment to openness, so ICANN should not have simply accepted the recommendation but instead should have investigated its basis.

ii

Second, the arbitrators decided they had power to give ICANN direction on what to do next, which they exercised by telling ICANN to continue to refrain from delegating the .africa name and to permit DotConnect's application to proceed through the remainder of the application process.

19

d

Although it prevailed in the arbitration, DotConnect did not emerge from the arbitration as the complete victor in all respects.

The arbitrators did not award rights to the .africa name to DotConnect.  DotConnect did not request such a ruling.

The arbitrators also qualified their ruling.  They wrote they were not delving into or deciding about DotConnect's other criticisms of ICANN.  For instance, the arbitrators made no findings, one way or the other, about Anne-Rachel Inné, Pierre Dandjinou, Moctar Yedaly, Nii Quaynor, Alice Munyua, Chris Disspain, Mike Silber, Chris LaHatte, or Alain Pellet.  Nor did the arbitrators validate or comment upon DotConnect's assertions that both the African Union Conference and ICANN had shown unfair favoritism or had preselected ZA.

DotConnect's win also was qualified in other ways.

There was the matter of timing.  DotConnect asked the arbitrators to order ICANN to give DotConnect 18 months to obtain support of 60 percent of the relevant governments—or simply to declare DotConnect already had satisfied that 60 percent requirement.  The arbitrators did not grant this relief.  The arbitrators did not make delay or time limits part of their ruling, which left ICANN free to act with dispatch after the ruling.

Good faith also was an issue.  In this appeal DotConnect accuses ICANN of deception, of rigging the process, and of using "every trick in the book" to strip DotConnect of "basic procedural protections."  The arbitrators found, however, ICANN had acted in good faith.  They had "no doubt" on this point.

20

Events now shifted back to ICANN.

On July 16, 2015, ICANN's board voted to obey the arbitrators' order. The board decided to refrain from delegating the .africa name, to permit DotConnect to proceed through the rest of the selection process, and to reimburse DotConnect for the arbitration costs.

The African Union Commission again wrote to ICANN to reiterate its support for ZA as the only applicant "officially endorsed and supported by the [African Union Commission] and hence African member states." The letter continued that the African Union Commission did not support DotConnect. Despite the Commission's initial support, the Commission later withdrew that support, with the "full knowledge" of DotConnect.

ICANN resumed evaluating DotConnect's application where it had left off: at the Geographic Names Panel evaluation. As was common with applications, the Geographic Names Panel posed questions to DotConnect.

DotConnect responded it would not revise its letters of support or offer new letters because it insisted its existing letters sufficed.

The Geographic Names Panel concluded DotConnect's letters of support were insufficient and therefore DotConnect had failed the Panel's evaluation.

ICANN then invited DotConnect to participate in its extended evaluation process, and DotConnect did pursue this process. DotConnect again refused, however, to revise or supplement its letters of support. The Geographic Names Panel concluded DotConnect's application did not pass the Panel's review.

At this point, ICANN procedures permit disappointed applicants to file a request for reconsideration. If an applicant seeks further review beyond that point, ICANN allows the applicant further recourse to its Independent Review Process. Applicants for .hotels, .charity, and .radio, for example, have followed this procedure.

DotConnect declined to request either reconsideration or independent review within the auspices of ICANN. Rather, DotConnect went to court.

5

On January 20, 2016, DotConnect sued ICANN in the Los Angeles Superior Court. ZA intervened. DotConnect's first amended complaint included 11 counts against ICANN and ZA.

The trial court held a three-day bench trial on ICANN's defense of judicial estoppel. The court rendered judgment and its final 12-page statement of decision on October 3, 2019.

DotConnect filed two appeals it moved to consolidate. The Court of Appeal granted this motion on July 14, 2020.

II

We affirm the judgment in all respects.

A

Judicial estoppel bars a party from gaining an advantage by taking one position and then seeking a second advantage by taking an incompatible position. The goals are to maintain the integrity of the judicial system and to protect parties from opponents' unfair strategies. The doctrine is discretionary and has five prerequisites: (1) The same party has taken two positions in (2) judicial or quasi-judicial administrative proceedings; (3) the party was successful in asserting the first position (that is, the tribunal adopted the position or accepted it

22

as true); (4) the two positions are totally inconsistent; and (5) the party did not take the first position as a result of ignorance, fraud, or mistake.  (*People v. Castillo* (2010) 49 Cal.4th 145, 155.)

We apply California law but observe federal law contains a similar doctrine.  (See *People v. Melendez* (2016) 2 Cal.5th 1, 23 ["in some circumstances, a party might be estopped from changing positions in litigation to gain an advantage.  (See generally *New Hampshire v. Maine* (2001) 532 U.S. 742, 749–750 [149 L.Ed.2d 968, 121 S.Ct. 1808].)"].)

We review the trial court's factfinding for substantial evidence.  We independently review whether judicial estoppel is proper on given facts.  If the elements for judicial estoppel are present, whether to apply the doctrine is within the trial court's discretion, which we review for an abuse of discretion.  (*Miller v. Bank of America, N.A.* (2013) 213 Cal.App.4th 1, 10.)

B

The trial court correctly applied judicial estoppel. DotConnect's actions satisfy the doctrine's elements.

First, DotConnect took two contrary positions.  It told the arbitrators on the Independent Review Panel it could not sue in court.  DotConnect then sued in court.

Second, DotConnect took these positions in quasi-judicial and judicial settings.  The first proceeding effectively was a quasi-judicial arbitration.  It was before the international arm of the American Arbitration Association.  The panel was a traditional arbitral panel with distinguished and experienced international arbitrators.  The procedures were legalistic; there were lawyers all around, and they took lawyerlike actions:  they engaged in procedural debate, discovery, briefing, and the oral and written presentation of testimony.  There were formalized

23

exhibits and the rules of evidence. The panel rendered a lengthy written decision that recited the parties' contentions, examined the evidence, and reasoned its way to legalistic conclusions on the basis of proofs and arguments. This setting was quasi-judicial.

Third, DotConnect used its initial position—"we cannot sue in court"—to persuade the panel to award DotConnect seven legal victories, as noted. The panel declared DotConnect the prevailing party and required ICANN to pay its costs.

Fourth, DotConnect's positions are totally inconsistent. "We cannot sue in court" is the opposite of "we can sue in court."

Fifth, DotConnect did not take its initial position as the result of fraud, ignorance, or mistake. Able counsel represented DotConnect throughout. The record shows DotConnect's lawyers were well-informed and were thinking ahead.

Finally, the trial court had an ample basis to decide, in its discretion, to apply the doctrine to this case. This decade of disputation was costly and delayed the use of something valuable to the worldwide public. Evidence suggested "the ongoing delay in the delegation of .africa is depriving the people of the African continent of an important opportunity to expand internet domain name capabilities. The .africa domain name would add brand value to the continent and would provide a platform that connects products, businesses, and individuals that have an interest in Africa."

Prolonging rivalry over name rights is undesirable. The trial court did not abuse its discretion.

## C

DotConnect's contrary arguments carry no force.

The record refutes DotConnect's claim its positions have been consistent. DotConnect told the panel it could not sue in

court.  Its statements were repeated and unqualified.  The panel accepted these assertions and used them in its legal reasoning, which declared DotConnect the prevailing party.  Then DotConnect sued in court.  That reversal was complete.

DotConnect makes an incorrect argument about context.  It says it made its statements about not suing in court *before* the panel ruled and it now is suing about events *after* the panel ruled, so the context is different and thus the meanings are different.

DotConnect is right to say courts interpreting text must consider context.  (E.g., *RMR Equipment Rental, Inc. v. Residential Fund 1347, LLC* (2021) 65 Cal.App.5th 383, 395–396.)  Context always informs text.  This holds equally in the doctrine of judicial estoppel.  (E.g., *Levin v. Ligon* (2006) 140 Cal.App.4th 1456, 1470 (*Levin*).)

This point does not aid DotConnect.  The context for its statements was its reference to the litigation waiver it signed when it applied for the .africa name.  The text of that litigation waiver was unequivocal, unconditional, and unlimited.  It remained so throughout the arbitration.  As we have noted, and again with our italics, DotConnect convinced the arbitrators to write that applicants like DotConnect had "waive[d] *all right* to resort to the courts."  The relevant context has remained the same.  This defeats DotConnect's argument.

DotConnect in oral argument noted that, after it filed suit in court, it attacked the breadth of this waiver and met with some success before a judge who then retired.  The superior court assigned the case to a new trial judge, who held a bench trial and ruled for ICANN on the basis of judicial estoppel.  The pretrial rulings in the trial court do not affect the substance of this

25

analysis.  The key is DotConnect told the arbitrators one unqualified thing and, having benefited from its argument, reversed field and did the opposite:  DotConnect sued in court.

DotConnect cites irrelevant holdings.  (See *State Farm General Ins. Co. v. Watts Regulator Co.* (2017) 17 Cal.App.5th 1093, 1102 ["There is no 'unfair strategy' in consenting to arbitration in one case and not in another."]; *Montegani v. Johnson* (2008) 162 Cal.App.4th 1231, 1239 ["when that 'admission' was made, it was correct"]; *Daar & Newman v. VRL Internat.* (2005) 129 Cal.App.4th 482, 486, 490–491 [case did not concern a single litigation waiver, but rather two different lawsuits, one that concerned a contract with a California party and one that did not]; *Kitty-Anne Music Co. v. Swan* (2003) 112 Cal.App.4th 30, 35–36 [party successfully opposing a summary judgment motion is not estopped from moving for summary judgment based upon the same evidence]; *Bell v. Wells Fargo Bank* (1998) 62 Cal.App.4th 1382, 1387–1388 [statements that sickness rendered man disabled and unable to perform his work did not estop him from seeking a reasonable accommodation for that work]; *Prilliman v. United Air Lines, Inc.* (1997) 53 Cal.App.4th 935, 953–964 [receiving benefits for disability did not estop pilot from contending he could perform nonflight work]; *Ng v. Hudson* (1977) 75 Cal.App.3d 250, 258 [the statement that a person suffered no pain or disability before an accident did not estop a request for an instruction about aggravation of a preexisting condition because preexisting conditions, if dormant or inactive, do not necessarily involve pain or disability], overruled on another ground in *Soule v. General Motors Corp.* (1994) 8 Cal.4th 548.)

On a different point, DotConnect offers neither holdings nor logic for its incorrect suggestion that judicial estoppel applies *only* when the party's inconsistent positions are factual in character. (Cf. *Levin, supra,* 140 Cal.App.4th at pp. 1472–1473 ["Levin argues that [*Cleveland v. Policy Management Systems Corp.* (1999) 526 U.S. 795] establishes that judicial estoppel cannot be applied when the inconsistency is not a purely factual statement but also involves a legal conclusion. This is a misreading of the case."]; see also *id.* at p. 1473.)

DotConnect's citations show that courts commonly apply judicial estoppel when a party makes inconsistent *factual* assertions. These citations do not show the doctrine exempts *legal* assertions. (See *ABF Capital Corp. v. Berglass* (2005) 130 Cal.App.4th 825, 832; *Tuchscher Development Enterprises, Inc. v. San Diego Unified Port District* (2003) 106 Cal.App.4th 1219, 1245; *California Amplifier, Inc. v. RLI Ins. Co.* (2001) 94 Cal.App.4th 102, 118.)

Even as DotConnect concedes the Independent Review Process "had all the hallmarks of an international arbitration," DotConnect maintains the arbitration was not a quasi-judicial forum. DotConnect presses two faulty arguments on this count.

First, DotConnect argues ICANN's independent review process was not binding on both parties, so the process was not quasi-judicial, and therefore judicial estoppel does not apply. Without reaching the question of whether a process must be binding to be quasi-judicial, we note the trial court found ICANN accepted the independent review panel's ruling. The fact the ICANN Board voted to *accept* the panel's ruling is not proof that ruling was *not* binding. The ruling was effectively binding: ICANN accepted it. This argument fails.

27

Second, DotConnect suggests the independent review process was not quasi-judicial because it offered no opportunity for judicial review. A major point of arbitration, however, is to *avoid* the judicial process. To support this claim, moreover, DotConnect cites no cases dealing with judicial estoppel. (See *Risam v. County of Los Angeles* (2002) 99 Cal.App.4th 412, 418–423 [no judicial estoppel holding]; *Bray v. Internat. Molders & Allied Workers Union* (1984) 155 Cal.App.3d 608, 613–618 [no judicial estoppel holding]; *Powers v. Northside Independent School Dist.* (W.D. Tex., Jan. 27, 2016, No. A-14-CA-1004-SS) 2016 WL 8788185 [no judicial estoppel holding].) This argument falters for want of authority.

DotConnect protests its earlier position never succeeded, which negates, it contends, the third element of judicial estoppel, which requires the tribunal to have adopted the position or accepted it as true. This argument is in error.

The trial court's findings here again are controlling. The trial court found that, as a result of DotConnect's assertion it could not sue ICANN in court, DotConnect persuaded the arbitrators to favor DotConnect with seven substantial victories. Recall DotConnect's seven victories were emergency interim relief, document discovery, extended briefing, live witness testimony, a de novo review standard, a declaration the ruling was binding, and a cost award. Substantial evidence supports this finding.

DotConnect's first position—that it could not sue in court—did persuade the arbitration panel repeatedly to rule for DotConnect on a range of significant issues. DotConnect's protest is not well-founded. (See *Jackson v. County of Los Angeles* (1997)

60 Cal.App.4th 171, 183 [explaining success factor is met if "tribunal adopted the position or accepted it as true"].)

DotConnect argues it did not take its first position in bad faith. Judicial estoppel, however, does not require bad faith. The trial court found DotConnect, when arguing the litigation waiver was effective, was not arguing as a result of ignorance, fraud, or mistake. In fact, the trial court found DotConnect maintained a "consistent strategic position." DotConnect took this "consistent strategic position" to support its requests the arbitrators rule in its favor on the seven procedural issues.

This consistent strategic position was not the product of ignorance, fraud, or mistake. (See *Bucur v. Ahmad* (2016) 244 Cal.App.4th 175, 188 [appellants "made no showing" that their first position, a decision they made "with the knowledge and consent of their former attorney, was the result of fraud, ignorance, or mistake"].) The trial court's finding was proper by law.

DotConnect charges the trial court generally abused its discretion by estopping DotConnect from altering its position on its litigation waiver. The court's decision was, however, reasonable. Neither did the trial court err in awarding costs against DotConnect.

## DISPOSITION

We affirm the judgment in all respects and award costs to the respondents.

WILEY, J.

We concur:

GRIMES, Acting P. J.

OHTA, J.*

---

\* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.